The Judges* delivered their opinions.
JUDGE ROANE,
after stating the case. With respect to the general question in this case, I take it to be clear that although a patent, perfect on its face, is only to be vacated for matter dehors the patent, by a proper and regular proceeding, 141 *yet that a patent may carry on its face intrinsic evidence of its own nullity, and be considered void, when exhibited in the progress of a trial. I will put the case of a patent obtained “for land now holden in fee by A.• or “for escheated land,’’ (at this day under the Commonwealth,) in the ordinary way, as if it were waste and unappropriated land: in either case, it does not want extraneous evidence to shew, that the Commonwealth has been deceived in its grant, or rather has granted that which was not grantable at all in the first case, or, in the second, in that mode, or for that consideration, which the law of the country justifies. The recognition of a principle going to defeat patents perfect as upon the face thereof, on the ground of extraneous and latent defects, by a regular proceeding, does not conflict with another principle, that a patent which is defective per se, is to be held void, in the first instance.
In the case before us, admitting for the present, that the act of 1785 applies, for the purpose of' perfecting entries for es-cheated land made in the time of Eord Fairfax; the question is, whether this patent is not void, as on its face; 1st. On the ground that it does not state that the es-cheat preceded the entry; and, 2dly. That it does not state that the escheat was regularly made by an inquisition. This last question is important; and I shall not now decide it, as there are other and plainer grounds on which I hold the judgment of the District Court to be evidently erroneous. On the one hand, it may be argued that the officers of the Commonwealth should be intended to have granted the patent on the proper documents only; and, on the other, it is a principle of our law, certainly not to be relaxed in favour' of a Lord Proprietor, and greatly for the liberty of the subject, that the King cannot enter upon the lands of a subject upon mere sur.mises, nor without the solemn inquisition of a Jury.
As to the 1st objection, it is only stated that the land escheated from Jonathan Monkhouse, deceased. There is nothing in the patent to shew that this escheat 142 happened *prior to the date of the entry; and the patent would be satisfied, if in fact that escheat had accrued after the entry, and before the date of the patent. I admit that my own opinion is, that, on a liberal scale of construction, the escheat must be taken to have been prior to the entry: but it is a rule, on the other hand, that patents are always to be taken in a sense most favorable for the King, and against the party, (a) Again, it is worthy of observation that the Junior Judge in the District Court considered that the escheat had accrued to the Commonwealth, and therefore accrued after the entry; and, if so, the entry, on which the patent' is grounded, was made at the time without authority; at a time when the land was actually holden by Monkhouse. This is at least sufficient to shew that the patent is uncertain in this particular; so uncertain as that one of the Judges of the Court below expounded it, as to the time of the accruing of the escheat, in a sense which is equally in conflict with the ground taken by the appellee’s counsel in this argument, and derogatory to the right of the Commonwealth .to have granted the land by this patent; nothing being more clear than that lands accruing to the Commonwealth by escheat are to be granted away under a regular inquisition, and sale by the escheator, only, and in consideration, not of the ancient composition money, as in this case, but of the actual price for which the same has been sold by the escheator. In the case of Pickett v. Dowdall, (b) it was said by Judge Pendleton, that, in subsequent grants, the prior forfeiture of a former grant should be recited: and the reason of this was given by Mr. Marshall, one of the counsel: it is, that, if the prior forfeiture were not recited, the former grant might prevail over the latter. But it is doing nothing to make that recital, unless it appears that the forfeiture not onlv preceded the second grant, but also preceded the foundation on which the second grant was erected. In the case before us, if the es-cheat be taken to have accrued at a time posterior to the entry on which the grant is *63 founded, although the grant in ques-143 tion * (having recited a forfeiture by escheat prior to its date) would prevail (ceteris paribus) against the original grant to Monkhouse, yet it does not follow that it would prevail against a grant to a third person, the inception as well as consummation of which, originated after the escheat had accrued; it does not follow that, as against other persons than those claiming under Monkhouse, it conveys any title; and, therefore, in an ejectment, in which the party recovering must shew a complete title, the grant was not on this ground proper to be given in evidence. Greenup ought not to have recovered against Alexander, when there might have been another person behind entitled to recover against him: the possession of Alexander ought only to have been devested in ■favour of the true owner.
I have thus considered this case as if the act of 1785 related to entries for escheated lands: if it did, and the escheat could, on this patent, be taken to have been anterior to the entry, the title of the appellee would have been complete: but my opinion is, that that act relates only to unappropriated and ungranted lands.
This is evident both from the preamble and body of the act, taken in a general view. The preamble states the mischief contemplated to be remedied, to be, that no mode existed for granting out the unappropriated lands of the Northern Neck. It is argued, however, that the general term “entries,” in the 4th section, (a) enlarges its operation so as to go beyond unappropriated lands, and to embrace entries for escheated lands. While it is admitted that the words of an enacting clause may go beyond the case stated in the preamble, it is the more natural construction, ceteris paribus, to consider them as merely coextensive therewith; as commensurate with, and calculated to remedy, the evil which gives rise to the act. But m the case before us, we do not stand merely on this general ground: admitting that the sense stated in the preamble was thus enlarged by the term “entries” as aforesaid standing singly, that term is again restrained by the following circumstances: 144 *lst. In using the said term “entries,” the same clause speaks of “surveys” founded thereon: therefore entries for unappropriated lands must be meant, since surveys are not necessary on entries for escheated lands or lots, 2dly. The clause says that the grants on the entries and surveys made in the life of the late proprietor shall be made out in the same manner as is by law directed in cases of other unappropriated lands. This term “other” undoubtedly imports that the lands to which the entries in question relate, are also unappropriated lands. 3dly. The 5th section, which is confined expressly to unappropriated lands as to future grants, shews that the former section which related to past entries, is to be taken under the same restriction. 4thly. When it is considered that the same session put into force, in the Northern Neck, the act concerning escheators, by which the escheated lands, in that territory also, were to be sold for full value, the provision in the 6th section of the act in question shews that the land required by the entries mentioned in the act must mean unappropriated land; and, Sthly. The same inference is drawn from the provision in the 5th section respecting caveats, which, as well as surveys, are, by the general land laws of this Commonwealth, confined to unappropriated lands, and do not apply to escheated lands.
Upon the whole, while I doubt extremely (to say the least) whether this patent is not void, for the reasons assigned, supposing the act of 1785 to extend to entries of this character, (for escheated lands,) I am clearly of opinion, that the act applies only to unappropriated lands for which entries had been made; and being thus confined, I am of opinion that the instruction of the Court below was erroneous; that the patent ought not to have been received as evidence of the appellee’s title; and that therefore the judgment be reversed.
JUDGE FLEMING.
The principal questions in this case are, whether the recital contained in the appellee’s patent, 145 Mated the 8th day of December, 1788, was conclusive evidence, that a title nad accrued to the Commonwealth by virtue of an inquest of escheat taken upon the death of Jonathan Monkhouse, in the patent named; and whether the said patent was likewise conclusive evidence of a title derived to the plaintiff, under the Commonwealth, unless the defendant should shew, in evidence to the Jury, a better title in himself, (or those under whom he claims,) derived from the Commonwealth, since the said escheat in the plaintiff’s patent mentioned happened? Such being the instruction given to the Jury at the trial in the District Court, as stated in the bill of exceptions.
On examining the records of the late proprietor’s office of the Northern Neck, now in the register’s office, I find, that, formerly, there was great solemnity used in obtaining patents for escheated lands; an instance of which I shall notice, in the case of land that escheated to the proprietor, on the death of Frances White, alias Lampton.
On the 3d June, 1729, Dr. Thomas Turner gave information by letter to Thomas Lee, the proprietor’s agent, that one Frances White, alias Lampton, had been seised of about 50 acres of land in the County of Richmond, now King George, and died without heirs, or having disposed of ihe same; and prayed to have the preference of a grant thereof.
On the 7th of April, 1720, Thomas Lee issued his warrant to Edward Barrow, surveyor of Richmond County, empowering him to survey the said land, and return the survey and plat to the office, in the customary time; in which warrant the agent recited that Turner had obtained a certificate, and published and returned the same, according to the rules of the office. At the foot of the warrant there is a direction to Turner that “when you return your survey you must bring Mrs. White’s title.” signed Thomas Lee.
Next in order is a survey, and plat of the land, made by J. Warner, surveyor of *64 King George County, the 27th 146 *of September, 1727, accompanied with White’s title papers, to wit, a deed for the land from Wm. Marshall to Thomas White, late husband of the intestate Frances, dated the 24th of October, 1713, and the will of Thomas White, dated the 20th of April, 1715, in which he devised the land to his wife Frances White; who afterwards married one Hampton. Then follows the warrant of inquest from Robert Carter, agent of the proprietors, and escheator of all the lands in the Northern Neck, directed to George Eskridge, deputy escheator, dated the 9th of May, 1729, directing to take an inquest of office on the said land; which was duly executed by the said deputy escheator, on the 4th of February, 1732, and returned to the proprietor’s office. After which, a grant for the land issued to Thomas Turner, in which the foregoing proceedings are recited, as follows: “Whereas it hath been set forth to the proprietor’s office by Thomas Turner, of the County of King George, that Frances White, alias Hampton, late of Richmond, now King George County, died seised of a parcel of land, situate, &c. without heirs, or making legal disposition thereof, which land is part of a tract granted unto Wm. Marshall, by deed out of the proprietor’s office, dated, &c. for 268 acres, and was by the said Marshall sold unto Thomas White, by deed, dated, &c. and by the said White, by his last will, bequeathed unto his wife, the said Frances White, (afterwards married to one Hampton,) to her proper use and behoof for ever; whereupon the said land, for want of heirs of the said Frances, es-cheated' to the proprietors; the said Thomas Turner moving to have the preference to a grant thereof, and an inquisition concerning the same being since taken, and returned to our said office, bearing date, &c. under the hand and seal of George Eskridge, gent, deputy escheator of our said proprietary; and, upon the oaths, and under the hands and seals of twelve lawful freeholders of the said County of King George, viz. Thomas Berry, &c. who brought in this verdict, viz. We do find that Frances White, alias Hampton, aforesaid, died seised of thirty-five acres of land; 147 *that she left no heir, nor made any disposition ' thereof in her life-time that we know of, and that she was no alien at the time of her death, and therefore we find the said thirty-five acres of land es-cheat to the honourable proprietors of this Northern Neck, as by the said inquisition doth, and may more fully appear. Know ye, therefore, that for divers good causes, &c. we have given, granted, &c. unto the said Thomas Turner, &c. the said 35 acres of land, &c. lying, &c. and bounded as followeth; to wit: Beginning, &c. to the beginning. Together, &c. To have and to hold, &c. yielding and paying, &c. Provided, &c. Given at our office in Bancaster County, &c. Witness our agent and attorney fully authorized thereto, dated, &c.”
By this it appears that in the time of the proprietorship of the late Hord Fairfax, great ceremonies were deemed necessary, and were used in obtaining patents for es-cheated lands in the Northern Neck, but I have not been able to procure the form of an escheat patent, without that territory. It appears, however, that, in the times of the proprietorship of Hady Culpeper and Hady Fairfax, less ceremony was used in obtaining such patents, than in later times p as they had sometimes been used without a prior inquest of office; but still there was a particular recital of previous ceremonies, having been observed, according to the rules of the office; as appears by the preamble of a patent issued to Edward Turberville; which is as follows: “Marguritte Hady Culpeper, Catharine Hady Fairfax, Proprietors of the Northern Neck of Virginia, To all, &c. Whereas Edward Turbervile, of the County of Richmond, hath set forth to our office, that Randolph Davenport died seised of 115 acres of land in the County of Westmoreland, and left no heirs behind him, nor did dispose thereof by will; whereupon the same escheats to us the said proprietors; and thereupon a certificate according to the rules of the office issued to make the same public, which being returned with an endorsement and under the hand of Thomas Sorrell, Deputy Clerk of the said County, certifying that the same 148 was duly *published, and no person appearing to dispute the title to'the said escheat, and the said Edward Turbervile moving to be preferred to escheat the same, Know ye, therefore, &c. that for divers good causes, &c. we, &c. have granted, made over, &c. unto the said Edward Turbervile, &c. all our right, title, &c. in and to the said 115 acres of land, &c. situate, &c. and bounded, &c. To have and to hold, &c. yielding and paying, &c. Provided, &c. Witness, &c.
In the patent before us there is a bare recital, “that by virtue of an entry made in the office of the late Hord Proprietor of the Northern Neck, bearing date the 6th of April, 1778, and in consideration of the ancient composition of 11. 5s. sterling paid by Christopher Greenup into the treasury of this Commonwealth, there is granted to the said Christopher Greenup, 235 acres and 30 poles of land, by survey, bearing date the 17th day of March, 1788, lying, &c. which said tract or parcel of land was escheated from a certain Jonathan Monkhouse, deceased, and bounded as folioweth, to wit,” &c. and the plaintiff produced no other title paper, or writing, in support of his title.
And all the evidence, that the land in question had escheated from Jonathan Monkhouse, is an assertion in Greenup’s entry, that the said Jonathan Monkhouse dying intestate, and without any known heir, the said land, part of a tract of 625 acres granted to John Hough, escheated to the Hord Proprietor.
In the margin of the entry (as appears by a copy from the register’s office) there is a note: “Advertisement issued, and entry and advertisement fees paid.”
What were the rules in the proprietor’s office, at the time Greenup’s entry was made, we are not informed. But I find that on application at the office for a grant of escheated land, the first step was to advertise the same.
What further steps were necessary (accord *65 ing to the rules of the office) to entitle the petitioner to grant we have no information. But, in the case before us, it does not appear that there was any publication 149 whatever, or any *other step taken by Greenup, between the date of his entry in 1778, and the survey in 1788, about eight months before he obtained a patent, which appears to me too defective to support his title to the land in controversy ; and therefore that the instructions given to the jury, as stated in the bill of exceptions, were errbneous.
Judge Blackstone, in the 3d volume of his Commentaries, page 259, when speaking of the inquests of office, in England, observes, “that they were devised by law, as authentic means to give the king his right by solemn matter of record, without which he, in general, can neither take, nor part from any thing. For,” says he, “it is part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon, or seize any man’s possessions, upon bare surmises, without the intervention of a Jury.”
If that be a sound general principle in England, where many of the people’s rights must yield to prerogative, how much more forcibly does it apply in our republican government?
Upon the whole, I concur in the opinion that the judgment be reversed.
Judgment reversed, and new trial awarded, with a direction, that1 ‘upon such trial, the Court below do not permit the patent to be given in evidence.”

Judge Tucker, having- been one of the Judges in the District Court, did not sit in this cause here.— Note in Original Edition.

 2 Bl. Com. 347.

 2 Wash. 106.

 2 Rev. Code 69.